7636

## MURPHY v. ATLANTA & CHARLOTTE AIR LINE RY.

R̲ailroads̲—A̲ppliances̲—C̲oupler̲—I̲ssues̲—A̲ssumption̲ of̲ R̲isks̲—F̲ellow̲ S̲ervants̲.—There being circumstantial evidence in this case from which the inference might have been drawn that the injury to plaintiff was caused by a defective coupling which failed to disconnect the cars, and the testimony as to assumption of risks and as to negligence of fellow servant, when considered with all the testi-

mony, being susceptible of more than one inference, these issues should have been sent to the jury.

Before WILSON, J., Greenville, March term, 1910. Reversed.

Action by Moore Murphy against Atlanta & Charlotte Air Line Railway Company. From order of nonsuit, plaintiff appeals.

*Messrs. McCullough & Blythe,* for appellant, cite: *Was there evidence of negligence?* 66 S. C., 258; 69 S. C., 529; 72 S. C., 389; 86 S. C., 137. *Evidence supported every allegation:* 67 S. C., 122; 66 S. C., 91; 75 S. C., 71. *Assumption of Risks:* Con., art. 1, sec. 15; 61 S. C., 479.

*Messrs. Cothran, Dean & Cothran,* contra, cite: *No negligence could be inferred from evidence:* 75 S. C., 102; 35 S. C., 405; 33 S. W., 718; 174 Fed., 337; 145 Fed., 273; 200 U. S., 480; 100 U. S., 686; 92 U. S., 281; 39 S. C., 39; 66 S. C., 256; 69 S. C., 529; 72 S. C., 398. *Plaintiff assumed risks:* 84 S. C., 283; 72 S. C., 264, 237; 74 S. C., 419; 87 Mo. App., 637; 1 LaB., secs. 268-9; 101 N. Y., Supp., 96; 104 S. W., 1088.

July 21, 1910. The opinion of the Court was delivered by

MR. JUSTICE GARY. This is an appeal from an order of nonsuit.

The allegations of the complaint, material to the questions raised by the exceptions, are as follows:

"That on April 24, 1906, plaintiff was employed as yard switchman in defendant's yards at Greenville, South Carolina, and had been employed in such capacity for about three years. That on said date, plaintiff was ordered by his superior officer to assist in shifting certain cars, consisting

of five box cars in the yards of the defendant at Greenville, South Carolina, for the purpose of placing two of said cars, next to the engine upon the 'bad order' track for certain repairs. That in order to accomplish this, three of said cars had to be moved further up track No. 6, upon which track said engine and cars were then being operated That in order to move the said cars, defendant, its agents and servants, required on this occasion, the said cars to be 'kicked', that is, to be backed at a high rate of speed for the purpose of imparting to the three cars to be 'kicked,' a sufficient momentum to carry them to the desired point, and at the proper time it was expected that they should be cut loose. That plaintiff was on the car farthest from the engine, ready to put on breaks at the proper time to stop the cars when 'kicked,' as he was ordered and directed to do; when suddenly, without any notice of warning to him, and while the three cars were still attached to the engine and other cars, the said engine suddenly stopped, and plaintiff was violently thrown from said car to the ground between the rails, and said cars ran over his body.

"That plaintiff's injuries were due to the negligence of defendant, its servants and agents, in requiring said cars to be shifted in this manner; in stopping said engine in such a sudden manner, while the three cars to be shifted were still attached thereto, and in not cutting them loose, so that they might continue south of their own momentum; by furnishing a defective coupler on the car attached to the engine, and from which the three cars to be shifted were to be cut loose; in not properly inspecting said appliances, so as to see that they were sufficient and adequate for the purpose intended; and in not providing plaintiff a safe place to do the work required of him, and appliances sufficient to do said work, all of which contributed to his injury as the proximate cause thereof."

The defendant denied the allegations of negligence, and set up the defense of assumption of risk.

At the close of the plaintiff's testimony the defendant made a motion for a nonsuit, on the following grounds:

1. "That the plaintiff's injuries were due to the risks of his employment, which he had assumed.

2. "That plaintiff's injuries were due to the risks of the peculiar service in which he was engaged at the time, the danger of which he well knew.

3. "That plaintiff's injuries were due to the negligence of a fellow servant.

4. "That there is no testimony tending to show actionable negligence, on the part of the defendant, in the matter of the alleged defect to coupling apparatus."

The motion was sustained, and the nonsuit granted on said grounds; thereupon the plaintiff appealed.

The first question that will be considered is, whether there was any testimony tending to show negligence on the part of the defendant.

The plaintiff testified as follows:

"When you talk about kicking cars, what do you mean? You give a kick signal to the engineer and he does the rest. What does he do, stop his engine? No, sir; he runs his engine. He runs it slow, or how? He runs it fast. What did you mean when the signal is given to kick cars, what does the engineer do? He comes ahead with a fast rate of speed, and when it goes far enough, they give a cut down signal, and the engine stops then. Suddenly? As quick as he can. Then what is done after the engine stops? He backs back. What is done with the cars? The cars go on up after they are cut off. What other way is there to get cars upon that track? Take and shove them up in there, and cut them off and put the brakes on, and back in and back out. You can shove them in how? Without kicking them. That is without going so fast? Yes, sir. On this occasion, what did the conductor do? He said he was going to kick three cars in on number six track, and he told me to ride them in there, and not to let them hit the other cars.

What rate of speed did the cars attain when he kicked them? Twelve or fifteen miles an hour. While the cars were going that way, what did the conductor do? He gave the engineer a cut down signal. Did you see him give the cut down signal to the engineer? Yes, sir. What was the engineer supposed to do when he received that signal? He was supposed to stop his engine as quick as he could. And what did the engineer do? He stopped his engine as quick as he could, and they failed to cut the cars off, and I was jerked off of the car."

Cross-Examination:

"You were relying upon the brakeman—what was his name? Hayes. You were relying upon him to cut the cars off, so that there would be no sudden stopping of the cars? I knew if he cut them off, there would be no sudden stopping. You were sitting there or standing there in the position that you have described to the jury, relying upon this brakeman to cut off the cars so there would be no abrupt stopping of them? Yes, sir. And your opinion is, that his failing to do that caused the car you were on to stop suddenly? No, sir; the engine did it. Well, the engine stopped it? Yes, sir. And if the cars had been cut off you would not have fallen off? I would not have been jerked off. You say you have never known a car to fail to uncouple, and in your opinion, it is not a frequent and daily occurrence known to all of you, that in kicking those cars, they would fail to disconnect, by either not raising the lever high enough, or by raising it too high? No, sir; if they are in good order they will cut loose."

Redirect Examination:

"You stated awhile ago, if something had been in good order, that it would not have done what it did. What do you mean by that? In cutting off the cars, if the lockpin in there had been in good order it would not have happened. Objected to by counsel for defendant. He alleges that the defect was in the coupler. Let him prove that. Objection

overruled. When you said if something had been in good order, that it would have been uncoupled, did you refer to the brakes or the coupler? The coupler."

Rule 393, in reference to conductors, was introduced in evidence, and is as follows: "They must not allow running or flying switches to be made where it can be avoided, and when unavoidable, such movements must be made with all care necessary to absolutely prevent accident."

W. A. Hayes thus testified:

"Just explain to the jury how this thing occurred, so far as your observation extended? Well, sir; we were kicking three cars in on number six track. The conductor gave me orders to cut off three cars, and when they were backed in there, I raised cut off lever, and it failed to cut off. And then there is a pin here that goes through the couplers? Yes, sir. And then there is a little chain fastened to an iron rod here, and comes out this way, and the lever is here at the side of the car? Yes, sir. And when you want to uncouple the cars, you lift up that lever and that brings up the pin, and the couplers are supposed to fly open, and the cars uncouple? Yes, sir. Where were you? On the side of the car. You say you were stationed at the side of the car for the purpose of cutting it loose when you got the signal? Yes, sir. Did you get the signal? Yes, sir. What did you do? I jerked the lever up. What were the cars supposed to do then? To come uncoupled. Did they come uncoupled? No, sir. What was the result? I raised the latchspring too high. What was done? Mr. Murphy was jerked from the top of the coal car. What is that (presenting coupling pin)? That is something like a latchpin. Is that a pin that moves up and down? Yes, sir; something like that. What kind of a coupler was it that you had? Climax, I think. What is this for? That works in a little notch back in there. I think that maybe it catches it and holds it. How? To lift it up higher. That is to keep it from coming too high? Yes, sir; I suppose so. If

it is in good condition, what will it do? I suppose it would have to cut loose, if it had been in good condition. Suppose that is worn (indicating), what would take place? I don't know how bad it would have to be worn to lift it too high. It would have to be worn a good deal for this to come out through there. If it is worn, what will take place? If it is worn, it wouldn't work so well, if it is worn bad. What would it do when you lift it up, if it is worn? Well, I don't think the cars would come uncoupled, if it is worn bad. You don't think the cars would come uncoupled? No, sir; it would raise too high. Did you examine that coupler? No, sir; I did not examine it at all. Those couplers are what are called automatic couplers? Yes, sir."

C. J. Bull testified as follows:

"By reason of your experience, are you familiar with this coupling pin (presenting same)? Yes, sir; pretty familiar with it. Explain to the jury there just how that coupler is constructed, and how they are presumed to work when in good condition? If they are in good condition, when you lift the lever they should cut at once, and there should be no hanging in that at all, if it is in a proper condition, and when you lift the lever, they will uncouple. What is that? That is a climax lock-pin. Where does that work? In the bottom of the draw-head. What does it do? It is to hold the pin to keep it from coming out too far, and this too. Now suppose that is in good condition, and that is in good condition (indicating) when you raise the lever, what would happen? It would come uncoupled. Suppose when you raise the lever it comes too high, so it won't uncouple, where is the defect? It is either in this, or in this, when it comes too high. Either one, it is defective (indicating on pin). The defect would be either in this or this (indicating)? Yes, sir; or this. When the defect is in this, or this, it will raise too high, and this catches the knuckles and keeps it from cutting loose. It comes up and slips into the

draw-head and catches the knuckles. Instead of coming up straight? Yes, sir; and stopping at the proper place, this comes into the draw-head and catches the knuckles. If that pin was in good condition, what would it do when you raised the lever? It would uncouple. When you jerked this by the knuckles, it is supposed to open here."

Cross-Examination:

"As I understand you, there are three places in one of these pins, that might wear too much to lift sufficient, two of them there, and that little knot there? It might wear a little at this point? Yes, sir. And it might wear at the knot in the middle sufficiently to lift it too high? Yes, sir. And then it wouldn't uncouple? Yes, sir. And then what else? This here (indicating). At the toe there? Yes, sir. It might wear enough at the toe to make it come too high? Yes, sir. How about here at the back of the top? I don't suppose that could wear too much, if that didn't break off. If it didn't break off, it couldn't come too high. How about the heel? If that would break, it would come too high. There are three places, the knot in the middle, the toe and the back here? Yes, sir. Suppose the chain should break? It wouldn't uncouple then. How would you tell it had been worn sufficiently to raise too high? That would be the only way, by lifting it. That would be by lifting at it to see? Yes, sir. The only safe test would be by lifting it? Yes, sir."

W. M. Logan thus testified:

"What is that (presenting lock-pin)? That is a lock-pin. What is that used for? For holding the knuckles in the draw-head. It is used for holding the knuckles in the draw-head, and letting it loose in coupling and uncoupling. It is used for holding the kunckles and letting them loose in coupling and uncoupling? Yes, sir. What is this here (indicating on coupler)? I call the whole thing the lock-pin. Do you know what that is for, that lip? It is to keep it from coming out of the draw-head there. That foot on the

lower part? Yes, sir. What is this for, and what is this for (indicating)? That works in a slot in there, and that works somewhere in there? I don't know just where, I never examined it. Do you know what it is intended for? It is intended to hold it in place, and make it couple and uncouple. Suppose that lock-pin is in good condition, and it is coupled, and you turn that crank, what would it do? It would uncouple, in my opinion. Suppose these are worn thin, or that, or this (indicating), what is the result? It lets that come up too far and catch the knuckles. In other words, I want you to give your opinion to that jury whether or not this coupler in good condition, and with this lock-pin in proper condition, when you raise that lever, would it uncouple? Yes, sir; that is my opinion. Can you raise it too high, if it is in a proper condition? No, sir; I don't think so. If the couplers are in good condition, and you raise this crank, or lever, what will happen? It will cut loose. When you drop it, what will happen? They will come together. By simply raising the lever? Yes, sir.

We see no difference in principle between this case and that of *Gilliland* v. *Ry.*, 86 S. C., 137, 68 S. E. R., 186.

In that case, the coupler failed to connect the cars, while in the present case, the coupler failed to disconnect them. In each case the question of negligence depended upon circumstantial evidence, which was similar in its nature.

The exceptions raising this question are therefore sustained.

The next question that will be considered is, whether the testimony showed that the plaintiff assumed the risk that caused his injury.

The testimony was susceptible of more than one inference; therefore, there was error in refusing to submit this question to the jury.

The next question to be determined is, whether the testimony showed that the injury resulted from the negligence of a fellow servant.

The only reference which the appellant's attorneys, in their argument, have made to this question, is as follows: "Hayes said in his testimony that he had pulled the lever up too high, and that it was his fault in doing so." This portion of his testimony must be considered in connection with his entire testimony, which shows that this question should have been submitted to the jury.

It is the judgment of this Court that the judgment of the Circuit Court be reversed.

MR. JUSTICE WOODS *concurs in the result.*